Louis Nuta and Elizabeth Nuta, Husband and Wife v. Commissioner.
Nuta v. Commissioner
Docket No. 31007.
United States Tax Court
1952 Tax Ct. Memo LEXIS 82; 11 T.C.M. (CCH) 954; T.C.M. (RIA) 52283; September 24, 1952
James Knight, Esq., for the petitioners. Francis L. Van Haaften, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This is a proceeding for redetermination of a deficiency in income tax of $21,404.26 of the petitioners for the year 1948. The only question for decision is whether the profit made on a sale of Government surplus airplane engines, parts, and tools owned by petitioners constituted ordinary income or long-term capital gain. Findings of Fact The petitioners, hereinafter called the taxpayers, are husband and wife. They filed their joint income tax return for 1948 with the collector for the Jacksonville Division of Florida. For many years prior to and including 1948, the taxpayer, Louis *83 Nuta, operated a ship or boat yard on a tract of land which, during the year in question, consisted of about 20 acres. His wife, during the period involved in this proceeding, also was connected with the business and supervised the office work. The business at the boat yard consisted primarily of servicing, repairing, and storing ships and boats, but also was concerned with the sale of new and used marine parts to customers. From the time the business was started it had been customary for its proprietors to buy surplus marine parts from Government agencies and Louis was on the mailing list of various Federal agencies for that purpose. Over the period from 1926 to the time of the hearing these purchases totaled many thousands of dollars. The surplus parts so bought were used in making repairs and many were resold to customers of the boat yard. The surplus parts were sometimes inventoried, but most of the time they were so numerous that no inventory was made. They were put "on the shelf" and sold, or junked when they became outdated. Louis was an airplane pilot and shortly after the war in 1945 he began the purchase of surplus aircraft parts from the Government. Most of these parts *84 were purchased already boxed and packed in marked cases. They were for military planes for the most part and were purchased in job lots. After purchases of aircraft parts were made they were shipped to the boat yard and there sorted. Until they were sorted taxpayers were unable to tell exactly what they had bought. Some parts could be used in the boat business. Storage space for the aircraft parts required several acres. The parts were not inventoried and were not segregated on the books of the taxpayers from the "surplus" marine parts kept for sale at the boat yard. A summary made from the taxpayers' books shows that between January 1, 1945 and March 31, 1947, a total of 26 separate purchases of surplus parts, including airplane parts, were made from the Government aggregating $27,340.73. During the same period 39 sales of these parts were made totaling $35,165.37. The taxpayers did not advertise surplus airplane parts for sale, but customers of the boat yard could and did buy such parts at the yard. Many people knew that the taxpayers had surplus aircraft parts for sale. In 1947, after accumulating a substantial quantity of surplus aircraft parts, the taxpayers got the idea *85 of starting an aviation school or going "in the aviation business". For that purpose the taxpayers leased a suitable tract of land in April 1947 for a period of five years, the lease terminable after 90 days by either party. The lease recited that the land was to be used "for general airport purposes, and for any type of aeroplane, automobile or motorcycle racing, and for the storage of aeroplanes and aeroplane parts". The taxpayers' plan in connection with the field was to use the surplus aircraft parts for sale and for repair parts in the same way that marine parts were used at the boat yard. A substantial part of the surplus aircraft parts was removed from the boat yard to the leased tract. No accurate records were kept of these parts and it is impossible to tell just what was moved there. The taxpayers did not know at the time of removal just what parts would be needed for "school" purposes or which would be sold. During the period April 1, 1947 to August 9, 1948 the taxpayers' records show 18 purchases of Government surplus parts, including airplane parts, aggregating $8,099.67. During the same period 32 sales were made totaling $147,599.71. All of the taxpayers' purchases *86 of Government surplus material were carried on their books in one account labeled "Inventory Salvage - Old Inventory". No distinction was made between aircraft and marine surplus material purchases. Entries did not indicate whether purchases were of aircraft or marine surplus. All of the taxpayers' sales of Government surplus material were carried on their books in one account labeled "Gov't Surplus, Sales - Salvage Material (at Cost)". No distinction was made between aircraft and marine surplus sales. Entries did not indicate whether sales were of aircraft or marine surplus. The taxpayers sold all surplus parts to anyone who came along if they could get the price they wanted. Negotiations for the requisite permits to operate the airport were unsuccessful. On August 9, 1948, the taxpayers sold to American Airmotive, a firm represented by Benjamin Epstein, for $100,000, all aircraft surplus parts on hand with certain exceptions not here important. Epstein had known Louis Nuta since the 1920's. He first discovered that the taxpayers had aircraft parts for sale when someone told him. Louis Nuta first set a price of $125,000 on the parts, but finally reduced this to $100,000. *87 The sale was made because the parts were starting "to get bad". The materials sold to Epstein had been purchased in lots on a number of occasions during the years 1945 through 1948. The sale was entered on the taxpayers' records in the same manner as other sales of surplus parts. The taxpayers treated the sale to American Airmotive as ordinary income on their records and so reported the profit on their income tax return for 1948. They here question such treatment. Opinion In arguing that the surplus aircraft parts sold by them were neither "property of a kind which would properly be included in the inventory of the (taxpayers)" nor "property held by the (taxpayers) primarily for sale to customers in the ordinary course of his trade or business" and so excluded from the definition of "capital assets" appearing in section 117(a) of the Internal Revenue Code, the taxpayers contend that they were not in the business of selling aircraft surplus or of running an airport, but were solely in the boat yard business. The facts do not support this contention. The taxpayers had purchased surplus marine parts from the Government for many years and had held them for *88 sale. Since about 1945 this custom of purchasing surplus material branched out to include aircraft or airplane parts. These surplus parts were also sold from time to time in substantial quantities over the years to any customer of the taxpayers who would pay the price. These sales were continuously made from 1945 when Louis first began to purchase such parts right up through 1948 when the largest bulk sale to American Airmotive was concluded. The record discloses no other purpose of the taxpayers in acquiring these parts than for resale to customers of the boat yard. The fact that they were sold at a "boat yard" rather than some other place of business of the taxpayers is of no significance. Nor is the fact that the taxpayers did not "advertise" that they had aircraft parts for sale. It was well known to many persons that the parts could be bought at the yard and many customers did make purchases there. Epstein, their biggest customer, learned that the taxpayers had such parts for sale by word of mouth. We think the facts conclusively show that the taxpayers' business of buying and selling surplus marine parts was inextricably tied in with the business of buying and selling surplus *89 airplane parts, at least from 1945 through 1948, the year here involved. No segregation of the two facets of the business was attempted on the taxpayers' books and we find no basis for making any differentiation. Even if we were to segregate, as suggested in the taxpayers' brief, the business at the boat yard from what was "intended" to be done at the airport, but was not done there because of permit troubles, we do not see how that would help. The evidence is that the taxpayers still would have held the bulk of the parts at the airport primarily for sale, and as a matter of fact, there is where the bulk of the parts was sold in the transaction at issue in this case. The question here is principally one of fact. Its answer depends to a large extent upon the intent of the taxpayers and full consideration of the surrounding evidentiary facts. Greene v. Commissioner, (C.A. 5), 141 Fed. (2d) 645. Under all the circumstances here we conclude that the surplus airplane parts sold to American Airmotive in 1948 were not capital assets, that they were held primarily for sale to customers in the ordinary course of business, and that the gain derived from that sale was ordinary *90 income. Decision will be entered for the respondent.